IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 7:16-cr-69-4 |
| | ) | |
| BRANDI ANN DOSS | ) | |

**MEMORANDUM OPINION**

The defendant Brandi Ann Doss raises two objections to the presentence investigation report (PSR). First, she challenges the drug weight that the PSR attributes to her. Second, she challenges the PSR's assessment of one point for the conviction in Paragraph 98. Both objections were argued before the court, and the parties have provided additional briefing addressing them. Having carefully considered the supplemental briefing as well as the entire record, the court will overrule the first objection, but sustain the second one, concluding that the conviction in Paragraph 98 should not be scored.

I. BACKGROUND

Doss was charged in two counts of a superseding indictment along with a number of co-defendants. Count One charged her with conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. Count Three charged her with distribution of methamphetamine on or about June 1, 2016, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). She pleaded guilty to both counts on July 6, 2017, and the PSR was prepared. As noted, she has raised two primary objections that are pending before the court: a challenge to the drug weight attributable to her for purposes of setting the base offense level, and a challenge to the scoring of the conviction referenced in Paragraph 98 of the PSR. The court addresses each in turn.

1

## II. DISCUSSION

**A. Objection to Drug Weight**

The charged conspiracy began in or about April 2015 and continued to on or about June 6, 2016. But all of the credible evidence before the court shows that Doss's participation was limited to the period of January 2016 to June 2016.[1] During that time period, Doss was romantically involved with Curtis Hilton, who was a leader and organizer of the conspiracy. Hilton was charged earlier in a separate indictment and recently has been sentenced. At his sentencing, he was held responsible for at least 15 but less than 45 kilograms of methamphetamine.

The PSR computed Doss's base offense level as a 36 based on finding her accountable for at least 15 kilograms but less than 45 kilograms of methamphetamine. At Doss's sentencing hearing, though, there was credible testimony from Hilton about slightly reduced amounts, and a correction from him about certain prior statements that referenced kilograms, but should have referenced pounds. In the light most favorable to Doss, the revised amounts that the PSR should hold Doss responsible for—as testified to by the Probation Officer and urged by counsel for the United States—are as follows:

- 16 pounds (or 7.25748 kilograms) of methamphetamine contained in the secret compartment of a GMC Envoy shipped by Hilton's supplier in January 2016, which was sold through various of Hilton's distributers through approximately March 2016.

- A total of 24 pounds (or 10.8862 kilograms) of methamphetamine that Hilton received from April to early June of 2016, approximately an eight-week period. This was based on Hilton's testimony that he received packages totaling no less than three pounds per week for those eight weeks.

---

[1] An agent testified about one individual who had bought methamphetamine directly from Doss on numerous occasions. That person told agents that Hilton and Doss had been dating since the fall of 2015, although no other evidence corroborates that date, and so the court does not credit it.

Taken together, these two amounts resulted in a revised total by the Probation Officer of 18.1437 kilograms, which is still within the 15-to-45-kilogram range.

Before addressing Doss's objection, the court addresses first the evidence supporting the three-pounds-per-week estimate by the probation officer, which was based primarily on Hilton's testimony. In Doss's supplemental sentencing memorandum, defense counsel stated that his handwritten notes from the hearing show that Hilton testified he received approximately one to two pounds per week at first and then in May, or closer to his arrest, the amounts increased to three pounds per week. The court has reviewed a rough draft of the sentencing transcript, and Mr. Hilton's testimony was inconsistent on this point.

Mr. Hilton testified on direct examination that he was initially receiving a pound or two in each package about twice a week. Based on those per-package amounts, the weekly amount initially would have been two to four pounds per week. He then said that as it got closer to his arrest in early June, the amount was probably "a little lower than that," but "[n]ot too much lower" and more "like three pounds a week." So, Hilton was suggesting that the amounts decreased closer to his arrest.

Then, on cross-examination, he agreed with defense counsel that he could not be certain how much he was receiving in April, May, and June, and he agreed that "the greater amounts maybe closer to three didn't come until towards the end when [he was] arrested." So, it "increased as [he] went along."

When counsel for the United States pointed out this discrepancy on redirect, Hilton acknowledged that he was not certain as to precise amounts, but was trying to be as honest as he could. He emphatically stated on redirect, though, that he knew he received no less than three pounds per week during that entire time period.

In the United States's supplemental memorandum, it continues to argue, as it did at the hearing, that the three-pounds-per-week amount should apply, which would still place Doss in the 15-to-45-kilogram range if those amounts and the amounts in the GMC Envoy are both attributable to her. But the United States also acknowledges that "there could be a calculation" which holds Doss accountable for the lesser amount of at least 5 kilograms but less than 15 kilograms. That calculation would be based on weekly amounts lower than three pounds per week in the April to June time-frame.

The court has carefully considered Hilton's testimony and believes that, even in the light most favorable to defendant, the estimate used by the probation officer is reasonable and appropriate. The government bears the burden to "prove by a preponderance of the evidence the quantity of drugs for which a defendant is responsible." *United States v. McGee*, 726 F.3d 263, 271 (4th Cir. 2013). In determining amounts of drugs for sentencing purposes, though, the court is not required to make "precise calculations," especially when no drugs are seized; the court may instead "'approximate' the quantity to be used for sentencing." *United States v. Uwaeme*, 975 F.2d 1016, 1019 (4th Cir. 1992) (citing U.S. Sentencing Guidelines Manual ("USSG") § 2D1.4 cmt. n.2).

Although Hilton's testimony was not entirely consistent, the court believes that his estimate of "no less than three pounds" per week was a reasonable estimate, and overall, his testimony was fairly consistent as to the amounts being around three pounds per week. Furthermore, even if some of the early weeks only involved two pounds, some of them may also have involved four, and so the court will credit the three-pound-per-week estimate. Thus, the court concludes the government has shown, by a preponderance of the evidence, that Hilton received an average of three pounds per week over that eight-week period.

The court now turns to the heart of Doss's objection, which is whether the amounts that Hilton received through both the Envoy and the packages in April to June are attributable to her. The amounts sold directly by Doss, even coupled with drug amounts converted from the three deposits of drug proceeds she made totaling at least $18,000,[2] would not place her in the 15-to-45-kilogram range, but drug quantities in this conspiracy case include relevant conduct. *United States v. Flores-Alvarado*, 779 F.3d 250, 255 (4th Cir. 2015). "Relevant conduct in conspiracy cases includes all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* (citing USSG § 1B1.3(a)(1)(B)). Put differently, acts of others in a jointly-undertaken criminal activity are those that were "within the scope of the defendant's agreement and . . . reasonably foreseeable to the defendant." *Id.*

The parties agree about most of the facts concerning Doss's involvement, although the parties disagree about the conclusions to be drawn from those facts. Doss, who was a heavy user of methamphetamine, met Hilton in January 2016 through her prostitution advertisements on the website "Backpage." She was engaged in prostitution at that time in order to support her drug habit. In mid-January 2016, Hilton helped Doss move from her current living situation and paid for her room at the Budget Inn on Williamson Road. Thereafter, she moved to another hotel and eventually to an extended-stay hotel, called the Affordable Corporate Suites, where she had what she and Hilton referred to as her "apartment." Over time, as he describes it, the two became close. Hilton was living with Doss (for at least some of the time), he repackaged and stored drugs in her apartment, and he sold drugs from there. Hilton asked her to sell smaller amounts for him when he was not available to his customers, although he claimed that he did not leave

---

[2] Doss made approximately three financial deposits for Mr. Hilton into various bank accounts, which would be routed back to his supplier. The estimated amounts ranged from $6,000 to $7,000 per deposit, according to Hilton.

5

large amounts with her, because of her addiction. He also supplied her with smaller amounts of drugs that she sold to her own customers. She was described by another co-conspirator as Hilton's "main side girl," whom Hilton trusted with the drugs and the money.

According to Doss, she thought she and Hilton were in a serious relationship, although Hilton apparently had ongoing sexual or other relationships with different women at the same time. One of those with whom he had a sexual relationship—Hilton described it as a "friends-with- benefits" relationship—was Doss's co-defendant, Joy Mason. Hilton testified that Doss knew of Mason in that she knew that Mason dealt drugs for him, but that Doss was not aware of his sexual encounters with Mason. Mason figures prominently in Doss's objections because Doss contends she did not agree to any distribution involving Mason and that she should not be held responsible for amounts that Mason dealt.

Mason and Doss, although co-defendants, did not have any direct dealings, and they occupied different positions in the conspiracy. Indeed, the PSR is clear—and the parties agree—that Doss was less involved than Mason in terms of drug amounts each woman dealt directly. For example, while Mason sold pound quantities of methamphetamine for Hilton and made many deposits of drug proceeds into bank accounts, Doss sold very small, mostly user-type amounts for him and made only three deposits. Hilton testified that Mason sold ten of the sixteen pounds that came in the Envoy for him and many of the pounds from the packages received from April to June. Mason sold primarily in Lynchburg and surrounding areas, rather than in Roanoke, where Doss sold. Mason also received packages of drugs for Hilton, but there is no evidence that Doss ever did.

In some ways, though, Doss was more involved in the conspiracy, due to her proximity to Hilton and his daily dealings. For example, with Doss's knowledge and consent, Hilton sold

6

drugs out of her apartment, among other locations.  He also used her apartment to break down and repackage drugs into distributable amounts.  And because she was not working at the time and had no means of transportation, Doss was almost always there when Hilton was.  He identified a number of people that came to that apartment to purchase methamphetamine from him or from Doss.  She also accompanied him when he made sales or deliveries to others.

It is also clear that Doss knew Mason's name and that Mason was a major dealer for Hilton.  In a June 2016 interview, Doss admitted that she knew that Joy Mason was a supplier in Lynchburg and that she and Hilton on one occasion had met Mason and supplied Mason with methamphetamine.  Hilton confirmed that Doss had been with him for at least one delivery that he made to Mason.

In her supporting memorandum, Doss offers a number of different calculations as to the drug amounts for which she should be accountable, but her arguments boil down to whether these larger amounts were both reasonably foreseeable to her *and* within the scope of her agreement with Hilton.  Doss's objection seems to be focused less on foreseeability and more on the fact that the amounts Mason sold for Hilton were not within the scope of Doss's agreement with Hilton, and thus cannot be relevant conduct attributable to Doss.  Nonetheless, the court will first explain its findings as to foreseeability.

To the extent Doss argues that the drug amounts dealt by Mason were not foreseeable to her, the court disagrees.  The court believes it is beyond dispute that it was at least foreseeable to Doss (if not outright known by her) that Hilton was moving large amounts of methamphetamine through Mason and others.  Based on the testimony at sentencing, for example, it is clear that Doss knew Hilton was receiving packages, knew about his source of supply, and that she, herself, was a regular dealer for him of eight-ball amounts (approximately 3.2 grams) at a time.

7

Doss sold approximately 14 grams per week for months. She knew that Hilton had several other people who sold for him, including Lewis Cheresnowsky and Mason, among others. She had been present with Hilton when he sold to Cheresnowsky and knew that he was receiving an eight-ball or more on a daily basis since January 2016. She went with Hilton to make at least one delivery to Mason and knew Mason was one of Hilton's biggest dealers.

With regard specifically to the GMC Envoy in which the 16 pounds of methamphetamine had come, Doss stated that she recalled Hilton operating that vehicle and that she recalled he had said he needed to go to Lynchburg to pack money in it, but she did not ask a lot of questions. Nonetheless, she sold amounts that came from that same shipment of methamphetamine, and she also sold some heroin that arrived in that vehicle. Mason, too, sold amounts from that vehicle.

In support of Doss's argument that the scope of her agreement and the "jointly undertaken criminal activity" did not include the amounts that Mason sold for Hilton, Doss points to two examples from the commentary to the guideline on relevant conduct:

> (v) Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity involved on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not within the scope of her jointly undertaken criminal activity (i.e., the one delivery).
>
> (vii) Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R. Defendant S is not accountable under subsection (a)(1)(B) for the other quantities imported by Defendant R because those quantities were not within the scope of his jointly undertaken criminal activity (i.e., the 500 grams).

USSG § 1B1.3 cmt. n. 4(C)(v).

These are easy examples because they make clear the scope of the defendant's agreement. In the first, it was only one delivery. In the second, it was an "agreement and conduct" limited to the distribution of a specific amount. It is more difficult to determine exactly the scope of Doss's agreement.

But in looking at her conduct, it is clear that her participation was much greater than either of these examples. There is no evidence that she limited her agreement to a specific amount or to only one occasion, or even a few occasions. She distributed drugs for Hilton on numerous occasions for almost six months, many times per week. She allowed him to use her apartment regularly to conduct drug transactions. She made deposits for him. She knew about his sources of supply and the methods of delivery, including that he was sending cash back in a car that had been sent by his supplier. Although Hilton apparently would not allow her to handle large amounts of methamphetamine because of her addiction, Doss was trusted enough by Hilton to deal for him, at least in smaller quantities, when he was not available. She also accompanied him as he delivered drugs to others, including at least one delivery to Mason. The scope of her agreement appeared to be to assist Hilton, even if she did not directly move large quantities for him. All of this conduct is reflective of the scope of her agreement, which is larger than just the amounts she distributed. The court thus concludes that the greater amounts in the Envoy and that Hilton received and sold in April through June 2016 are properly attributable to Doss as relevant conduct.

For further support, Doss relies on an out-of-circuit case, *United States v. Carmody*, 753 F. Supp. 917 (M.D. Ala. 1990), in which the court concluded that certain drug amounts manufactured by a co-conspirator named Brooks were not attributable to lower-level dealers

because, although they were foreseeable, the larger amounts were not within the scope of the agreement. There, three defendants all received smaller drug amounts from Brooks. Initially the drugs came through two other intermediate suppliers, but eventually Brooks sold directly to two of the three defendants and at times when the third was present. Brooks also testified that the three knew that he was manufacturing methamphetamine and were aware of the scope and profitability of his operations. The court concluded that that knowledge and foreseeability were insufficient to attribute those larger amounts to the three defendants. *Id.* at 920–21. But again, Doss's level of involvement was greater and she was not just dealing for Hilton, but assisting him in many ways. Even if it were a binding case, *Carmody* would not control the outcome here.

The cases relied upon by the government, although not directly on point factually, support the court's conclusion. In *United States v. Berger*, No. 16-4572, 2017 WL 4005025 (4th Cir. Sept. 12, 2017) (per curiam), for example, the Fourth Circuit affirmed the district court's inclusion, as relevant conduct, of amounts distributed by one of the defendant's nephews. In that case, the nephew "frequently converted cocaine into crack at [the defendant's] residence over a three-year period" and compensated the defendant "for the use of his residence in cocaine and cash." 2017 WL 4005025, at *1. Similarly here, Hilton was dealing drugs from Doss's apartment, she accompanied him on delivery runs to Mason and others, and she deposited funds for him. While she may not have sold larger quantities of drugs, she was part of the conspiracy to do so and agreed to be a part of that conspiracy by all of her actions and conduct.

*United States v. Oiler*, 282 F. App'x 285 (4th Cir. 2008), also supports the court's conclusion that the amounts dealt by Hilton are relevant conduct for Doss. In *Oiler*, the defendants were a husband and wife who were both convicted of a conspiracy to distribute cocaine base. The wife argued that certain drugs that her husband had purchased outside of the

10

scope of the conspiracy, from an individual with whom she did not have contact should not have been attributed to her. The district court disagreed, and the Fourth Circuit affirmed. The appellate court reasoned that the drugs were attributable to the wife because she obtained drugs on a regular basis from the husband for distribution, she was familiar with her husband's supplier, and it appeared that the drugs were purchased to promote the object of the conspiracy. *Id.* at 286. So too here.

The court also finds instructive *United States v. Kasprowski*, 105 F.3d 649 (4th Cir. 1996) (unpublished table decision). In that case, the defendant argued that she had made only one direct sale and so additional drug amounts that her boyfriend sold could not be attributed to her as relevant conduct. But the evidence also showed that she was directly involved in the overall scheme. For example, she boasted to an informant that she "keeps the money" and that the boyfriend had asked her to stay in the apartment and take care of business. *Id.* at *1. She also said she possessed a beeper and that she intended to give out code numbers for use with that beeper. *Id.* Given her involvement in more than one instance, the Fourth Circuit concluded that the district court did not clearly err in concluding that the additional sales by her boyfriend were relevant conduct attributable to her. *Id.* at *4. For the reasons already highlighted above, the court believes the facts here more closely resemble the facts in *Kasprowski* than in the guideline examples. The court thus concludes that the PSR reasonably attributes to Doss the 18 kilograms discussed above. Doss's objection as to the drug weight is OVERRULED.

**B. Objection to Criminal History**

With regard to her criminal history, Doss argues that she should not have been assessed one criminal history point as set forth in paragraph 98 of the PSR. As explained in that paragraph, Doss was originally charged with felony obtain or attempt to obtain Lortab and pled

11

guilty. Her plea and plea agreement were taken under advisement. On June 14, 2007, the proceedings were deferred pursuant to her plea agreement and Virginia Code § 18.2-258.1(H). That statute, for which she qualified, requires compliance with certain conditions. Fulfillment of those conditions results in a misdemeanor conviction. Failure to comply with the conditions results in a felony conviction. Eventually, on March 10, 2009, following an extension of probation for an unknown violation nine months earlier, she was convicted of misdemeanor interference with property rights of another and sentenced to a $100 fine, suspended on condition of good behavior for 12 months. The court, upon review of the underlying documents in the state court case and the statute, concludes that her conviction is not a diversionary disposition.

The probation officer in this case originally believed, and the current version of the PSR reflects, that this conviction should be scored one point as a diversionary sentence, pursuant to USSG § 4A1.2(f). The probation officer has since communicated with the United States Sentencing Commission, including some discussions in which counsel for Doss and the United States participated. The probation officer has advised the court that he now believes that the one point should not be assessed.

The court has not requested a revised PSR, and the court does not know whether the United States objects to this new determination, although the United States had initially taken the position that it believed the conviction was properly scored. But the court will briefly explain why the new recommendation is correct.

There are two guideline provisions that are potentially applicable here—USSG § 4A1.2(f) and USSG § 4A1.2(c). The first provision, § 4A1.2(c)(1), notes that if a prior misdemeanor or petty offense is an offense listed in that provision or "similar to" a listed offense, it is counted only if "(A) the sentence was a term of probation of more than one year or

12

a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." USSG § 4A1.2(c)(1). The offense Doss was convicted of and sentenced for was a violation of Virginia Code § 18.2-121, which is a trespassing statute. As the parties appear to agree, that offense is either the same or "similar to" trespassing, which is one of the listed offenses in § 4A1.2(c)(1). *See United States v. Tigney*, 367 F.3d 200, 201–02 (4th Cir. 2004) (directing courts to look to the elements of the two offenses to determine if they are similar for purposes of § 4A1.2(c), not to the facts of the underlying offense); *see also* § 4A1.2(c)(1), cmt. n. 12(a) (listing factors that the court should consider to determine whether two offenses are "similar" and including the elements of the offense as one of the factors). That being the case, the sentence should be counted "only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days"—which it was not; or "(B) the prior offense was similar to an instant offense"—which it is not. *See* USSG § 4A1.2(c)(1). Thus, if the court were only applying this provision, the conviction should not be scored.

The confusion arose in this case because Doss initially was charged with a different felony offense ("obtain or attempt to obtain Lortab") and pled guilty, but that proceeding was deferred by plea agreement and operation of statute. Initially, then, the probation officer explained his reasoning that, because Doss received what he deemed a diversionary sentence (a sentence suspended for good behavior), the diversionary sentence should be scored under USSG § 4A1.2(f). And if the court treated that initial deferral as a diversionary disposition, then under § 4A1.2(f) it appears it should be scored one point. That provision directs that diversionary sentences where guilt was admitted by the defendant should be counted and scored "even if a conviction is not formally entered." USSG § 4A1.2(f).

13

Here, of course, a conviction *was* "formally entered," and so the court believes that that conviction and sentence should control. Put differently, the ultimate disposition here was not a diversionary disposition at all. Although initially the proceeding was deferred, Doss was nonetheless actually convicted of an offense and sentenced for it. *See, e.g.*, *United States v. Medina*, 718 F.3d 364, 365 (4th Cir. 2013) (describing a diversionary disposition as one "in which a court sentences a criminal defendant but does not formally enter judgment against him"); James A. Shapiro, *Comity of Errors: When Federal Sentencing Guidelines Ignore State Law Decriminalizing Sentences*, 41 Akron L. Rev. 231, 231 (2008) ("Diversionary dispositions are sentences that generally do not count as convictions under state law.").

That Doss's conviction here was not a "diversionary disposition" is also evident from a review of the state statutory scheme under which she was convicted. *See United States v. Bagheri*, 999 F.2d 80, 82–83 (4th Cir. 1993) (looking to Maryland statute governing cases of probation without entry of judgment in deciding whether defendant's prior diversionary disposition should be counted under 4A1.2(f)); *United States v. Kristl*, 437 F.3d 1050, 1056–57 (10th Cir. 2006) (directing courts to examine state statutory schemes for reducing a sentence to determine whether to consider an original sentence or a subsequently-imposed sentence for federal sentencing purposes).[3] Specifically, Virginia Code § 18.2-258.1(H) allows a court to place "on probation upon terms and conditions" a defendant charged with the drug offense set forth in that statute, if that defendant meets certain criteria and either pleads guilty or for whom there are facts justifying a finding of guilt. It then explains the options available to the court for

---

[3] In *Kristl*, a state sentence was imposed, but then altered by reconsideration or resentencing pursuant to a state procedural rule. The Tenth Circuit held that "where the record shows that the reconsidered sentence [under Colorado Rule 35(b)] is a reduction for good behavior, rather than a reduction because of reconsideration of the law and of the facts as they stood . . . at the time of the original sentence, the original sentence must be used for criminal history purposes." 437 F.3d at 1057. As applied to the case before it, the court said the original sentence should not have been used because the government had not shown that the sentence was reconsidered merely for good behavior. *Id.* at 1058.

14

the ultimate disposition of the case: "Upon violation of a term or condition, the court may enter an adjudication of guilt upon the felony and proceed as otherwise provided. Upon fulfillment of the terms and conditions of probation, the court shall find the defendant guilty of a Class 1 misdemeanor." Va. Code § 18.2-258.1(H).

Thus, the statutory scheme under which Doss was sentenced does not provide a means for the state court to not enter a conviction at all, which is the general definition of a diversionary disposition. Instead, the state court is faced with two options: find a violation of the probationary terms and impose a felony conviction, or find the defendant has complied with the probationary terms and impose a misdemeanor conviction. Here, although there may have been an early violation of a term by Doss, she must ultimately have been found to have fulfilled the terms and conditions of her probation because she was only convicted of a misdemeanor. Thus, the only conviction and sentence imposed is the one that the court will assess. And quite clearly, under USSG § 4A1.2(c)(1), that offense should not be scored.

Barring any objection by the United States, then, the court will not assess Doss any points for the conviction referenced in Paragraph 98. The court notes also that the United States has already conceded that, aside from the scoring of that conviction, Doss would be entitled to the benefit of the so-called safety valve. *See* 18 U.S.C. § 3553(f)(1)–(5); USSG § 5C1.2. Having found the point inapplicable, thereby rendering her eligible for that benefit, the court concludes that Doss would not be subject to any statutory mandatory minimum and that her total offense level would be a 31, rather than a 33. A total offense level, combined with her criminal history category of I, results in a revised advisory guideline range for a term of imprisonment of 108 to 135 months. At the continuation of the sentencing hearing, though, the court will allow the

15

United States to offer further argument or any objection as to the court's decision not to assign that point.

### III. CONCLUSION

For the foregoing reasons, the court concludes that Doss's base offense level was properly identified as a 36 based on drug amounts, including relevant conduct, of approximately 18 kilograms, and that the conviction in paragraph 98 should not be scored. Of course, nothing herein limits the court from considering any arguments of the parties that are relevant to the 18 U.S.C. § 3553(a) factors and defendant's request for a variance sentence.

Entered: October 30, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge